J-S19013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AARON NADAE YOUNG | : | No. 1479 MDA 2022 |

Appeal from the Order Entered October 3, 2022
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0001488-2021

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED SEPTEMBER 5, 2023**

The Commonwealth appeals from the trial court's October 3, 2022 order granting Aaron Nadae Young's pretrial motion to suppress evidence seized, and statements he made, during a traffic stop of his vehicle.  After careful review, we affirm.

The trial court summarized the procedural and factual history of this case, as follows:

> [Young] was charged with possession with intent to deliver, possession of a controlled substance, possession of drug paraphernalia, and a summary traffic offense.  The charges [arose] from police conducting a traffic stop of [Young's] car in the parking lot of an apartment complex.  [Young] filed this omnibus pretrial motion on February 25, 2022.  This court held a hearing on the motion on May 17, 2022.
>
> In his omnibus motion, [Young] first argues that the warrantless search of his vehicle was based on coerced consent[,] and the evidence seized and statements made as a result must be suppressed.  Secondly, [Young] argues that the traffic stop was extended into a drug investigation without reasonable suspicion and all evidence seized pursuant to the unlawful investigation

should be suppressed. Thirdly, [Young] maintains the search warrant obtained to search his vehicle is fruit of the poisonous tree and all evidentiary items seized from the vehicle pursuant to the warrant must be suppressed. This court ordered counsel to file briefs and [Young] filed his brief on July 12, 2022[.] … [T]he Commonwealth responded on August 16, 2022.

**Background and Testimony**

Officer Gino Caschera (Caschera) of the Williamsport Bureau of Police testified on behalf of the Commonwealth. On October 31, 2021, at approximately 11:00 p.m., Caschera was on duty patrolling the area of Memorial Avenue and First Avenue in the city of Williamsport in a marked patrol unit with his partner, Officer [Nikita] Bonnell (Bonnell). Caschera observed a white Lincoln make a wide turn onto First Avenue from Park Place that caught his attention. Caschera positioned his patrol unit behind the Lincoln and watched as it turned onto Park Lane without utilizing a turn signal. The Lincoln immediately turned off … Park Lane into a parking lot, nearly striking a parked dump truck. Following this observation, Caschera activated his emergency lights and initiated a traffic stop on the Lincoln. At this point, Caschera had viewed three (3) separate traffic violations and was concerned the driver may have been intoxicated.

The Lincoln pulled into a parking spot and Caschera made contact with the driver, later identified as [Young], who had rolled his window down approximately a third of the way. [Young] immediately questioned Caschera why he was being stopped and Caschera "informed him that he had a turn signal violation, but not to worry[, Caschera] wasn't looking to give him a citation. Again, [Caschera] just wanted to make sure he was not intoxicated." Caschera further testified that he could immediately smell the odor of [raw] marijuana coming out of the vehicle. Caschera asked [Young] for his license and registration. [Young] provided his license but said that he did not have any paperwork in his vehicle. Caschera asked if [Young] had electronic paperwork on his cell phone and [Young] said yes and began searching on his phone for his insurance information. While [Young] was looking on his phone, Caschera inquired where [Young] was coming from and [Young] simply replied[, "]Sheetz.["] When Caschera asked [Young] what he purchased from Sheetz[, Appellant] did not respond.

Caschera noted that [Young] appeared to be shaking and breathing heavily as if he were nervous. Caschera repeated his question[,] asking [Young] what he bought from Sheetz[,] and [Young] said that he had changed his mind [and not purchased anything]. Eventually, [Young] found his insurance information on his phone and held it up to the window for Caschera to view it. As Caschera leaned in closer to the car to see better, he stated the odor of raw marijuana became stronger. Caschera asked [Young] to step out of his vehicle and speak with him in between [Young's] car and the patrol unit. Caschera testified to three (3) reasons he wished to speak with [Young] out of the vehicle: (1) he believe[s] it makes people more comfortable during a traffic stop to speak face-to-face rather than have the officer speak down to them, (2) Caschera wanted to ensure [Young] was not impaired and watching him exit the vehicle would give Caschera a chance to observe his body language for impairment, and (3) Caschera wanted the entire interaction to be captured on the MVR footage and [Young's] position in his parked car would not have made that possible. Caschera denied manipulating the MVR in any way [or] tampering with the settings. Caschera stated that the footage from the night in question is missing audio due to a lack of [an] out-of-car microphone in the unit.

Caschera brought [Young] to the front of his patrol car and explained that he could smell raw marijuana emitting from [Young's] vehicle. [Young] admitted to smoking marijuana earlier that day. Caschera testified he was familiar with the Medical Marijuana Act and knew that the Act prohibited those carrying a medical marijuana card to smoke medical marijuana.[1] For this reason, Caschera said he was concerned that illegal marijuana was located in [Young's] car. Caschera asked [Young] for consent to search the vehicle and [Young] "stated he was unsure, and … he didn't feel there was a reason for [the officer] to search his vehicle." Caschera … repeated his reasoning to [Young], namely the smell of marijuana, and [he] explained to [Young] that "[the officer] can't just search his vehicle based on the odor of marijuana. New case law … states that [Caschera] would have to

_____

[1] Under the Medical Marijuana Act, "dry leaf or plant medical marijuana is available to certified patients and can be consumed by way of vaporization." ***Commonwealth v. Barr***, 266 A.3d 25, 41 (Pa. 2021). "It, however, remains illegal to smoke this product." ***Id.*** at 41 n.13 (citing 35 P.S. § 10231.304(b)(1)).

get a search warrant, tow the vehicle, obtain a search warrant for the vehicle, and go that route."

Caschera also told [Young] that he was not concerned about a small amount of marijuana, but he wanted to make sure nothing else illegal was in the car. While Caschera was explaining all of this to [Young], [Young] told Caschera to go ahead and unlocked his vehicle. Caschera told [Young] that he did not have to consent to his car being searched and if he denied consent to search he would not face additional consequences. [Young] repeated, "go ahead" and unlocked the vehicle again with the key fob.

Bonnell began searching the car while Caschera continued to speak with [Young]. [Young] was pacing back-and-forth but Caschera did not think anything was out of the ordinary. However, Caschera stated that [Young] had trouble answering normal questions, such as his place of employment, which made Caschera believe that he was very nervous. [Young] was "fixated" on Bonnell while searching the vehicle, was not making eye contact with Caschera, and appeared to walk towards the door of an apartment building to the extent that Caschera had to reprimand him to come back towards the car or have a seat. Caschera believed the interaction to be casual but thought [Young] was exhibiting signs of nervousness. During his conversation with [Young] while waiting for Bonnell to conduct the search, Bonnell told Caschera to place [Young] in handcuffs. Caschera did so and searched [Young] incident to the arrest and located a black container containing raw marijuana in the pocket of his hoodie. After [Young was] … placed in the patrol unit, Bonnell returned to [Young's] car and retrieved a brick of heroin and held it up for Caschera to see. [Young] then said, "they placed that bag of heroin in the car." Caschera further testified that neither he nor Bonnell had mentioned that there was heroin involved prior to [Young's] statement.

At this point, Caschera asked his supervisor if they could tow [Young's] vehicle in order to get a search warrant. Since [Young] was in custody and a suspected controlled substance had been found, Caschera thought [Young's] consent would have been coerced so he decided to proceed with caution. At the direction of the attorney for the Commonwealth, Caschera had returned to the Schoolhouse Apartment Complex where the incident had taken place in order to capture photographs of the scene prior to testifying at the hearing on this motion. The Commonwealth introduced these photographs, marked as Commonwealth's

Exhibits 1 through 3, which detailed the parking lot and entrances to the apartment building. [Young] told Caschera that his girlfriend lived in this apartment complex.

\*\*\*

Caschera believed he had probable cause to obtain a search warrant for [Young's] car because of the odor of marijuana, [Young's] confession to smoking marijuana earlier that day, [Young's] displaying deceptive behaviors, "such as telling me he was coming from Sheetz but having … no items from Sheetz in his vehicle. I asked him what he purchased at Sheetz, and he just said[, 'I changed my mind.[']  He was dismissive and didn't want to answer questions, and was very apparently nervous. When I got him out of the car it was the same … type of behavior, which to me usually leads to someone who's nervous about what's in the vehicle." Caschera agreed that [Young] did not agree to the search of his car until Caschera mentioned towing it, but [he] did not believe it was a direct correlation. Caschera could not recall how long it was before he returned [Young's] license, but he did remember giving it back to him after a considerable amount of time.

Officer … Bonnell … of the Williamsport City Police also testified on behalf of the Commonwealth. Bonnell testified that she has been partners with Caschera for approximately three (3) years and they routinely operate vehicle 68. This unit is one of the oldest vehicles in the department and is missing a recording device that allows for audio to be recorded outside the vehicle. Bonnell stated that she has touched the MVR camera occasionally[,] but only to rotate it. Bonnell was not aware of the camera's zoom settings, if any existed. On October 3[1], 2021, Bonnell came in contact with [Young] after watching a white Lincoln make a wide turn onto First Avenue. The vehicle then turned onto Park Lane without using a turn signal. The car entered a parking lot for an apartment complex and nearly struck a parked dump truck. Caschera activated the emergency lights and conducted a traffic stop. Bonnell approached the vehicle on the passenger side while Caschera made primary contact with [Young].

While Caschera spoke with [Young], Bonnell used a flashlight to look into the car. Bonnell said it is standard procedure for them to remove a driver from their vehicle during a traffic stop for safety in order to capture the stop on the MVR[,] as well as make citizens more comfortable during the interaction. Bonnell was able to observe [Young] when he was outside of his vehicle interacting

with Caschera at the front of the patrol unit. Bonnell stated that [Young] was pacing in circles and would stare at his car while speaking with Caschera. Bonnell believed that [Young's] demeanor appeared to be very nervous. Following [Young's] consent to search the vehicle, Bonnell put gloves on and began searching the passenger side first. Upon opening the front passenger door, Bonnell immediately noticed that the "center panel where the radio would be right under the center console panel was completely pulled off of the plastic part." Bonnell looked in the panel but did not find anything there.

However, upon looking in the passenger side panel door, Bonnell discovered a green vial containing flakes of marijuana. While on the driver's side, Bonnell noticed the center console panel was also disconnected, similar to the passenger side. Bonnell pulled on this panel slightly and observed a clear baggie containing a brick of heroin. Bonnell removed the heroin and placed it on the front seat. Bonnell quickly walked over to Caschera and advised him that [Young] would need to be handcuffed. Bonnell returned to the vehicle and took possession of the suspected heroin. Bonnell could not remember if she showed the seized evidence to the MVR camera. Bonnell indicated that once the brick was counted, seventy (70) bags of heroin were contained in the bundle. [Young's] car was towed and a search warrant for the car was obtained. When executing the search warrant, no additional evidence was located in the vehicle. Bonnell later clarified that she misnamed the area of [Young's] car where the heroin was found by calling it the center console when in reality it was considered a "side panel[,]"[] under the radio.

Trial Court Opinion (TCO), 10/3/22, at 1-7 (citations to the record omitted).

Based on the evidence presented at the suppression hearing, and the arguments set forth by the parties in their subsequent briefs, the court issued an order and opinion on October 3, 2022, granting Young's motion to suppress. The court concluded that while Young's initial detention to investigate his possible impairment was lawful, that detention was unlawfully extended into a drug investigation "the moment [Young] exited his car and was asked for consent to search the vehicle…." *Id.* at 12. The court found

that the officers did not possess reasonable suspicion that Young possessed illegal narcotics based only on Young's nervousness, reluctance to answer Officer Caschera's questions, and the smell of raw marijuana. *Id.* at 13. Thus, the court concluded that Young's detention was unlawful and, accordingly, his subsequent consent to search the vehicle was involuntary. *Id.* at 15-16. Alternatively, the court determined that, even if Young's detention was legal, his consent to search the vehicle was coerced by Officer Caschera's "implied compulsion on [Young] to consent to the search based on the ramifications [that] denying consent would bring[,]" namely, the seizure and towing of Young's vehicle. *Id.* at 17. Finally, the court concluded that the search warrant obtained by Officer Caschera was fruit of the poisonous tree of Young's unlawful detention and/or his coerced consent to search the car and, therefore, the warrant was likewise invalid. *Id.* at 17-18.

The Commonwealth filed a timely notice of appeal, certifying that the court's suppression order terminates or substantially handicaps Young's prosecution. *See* Pa.R.A.P. 311(d). The Commonwealth thereafter complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and the court filed a Rule 1925(a) statement indicating that it was relying on the rationale set forth in its October 3, 2022 opinion granting Young's motion to suppress to support its decision.

Herein, the Commonwealth states three issues for our review:

I. Whether the suppression court committed an error of law when it failed to properly apply an objective standard when analyzing

whether the [o]fficers had reasonable suspicion to detain … [Young].

II. Whether the suppression court committed an error of law when it found the officer's explanation that he would seek a warrant, without additional factors, rendered … [Young's] subsequent consent involuntary.

III. Whether the suppression court erred when it held that the search warrant was "fruit of the poisonous tree."

Commonwealth's Brief at 6.

Preliminarily, we recognize:

"When reviewing the grant of a suppression motion, we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. McCleary*, 193 A.3d 387, 390 (Pa. Super. 2018) (citation omitted). "We may only consider evidence presented at the suppression hearing." *Id.* (citation omitted). "[B]ecause the defendant prevailed on this issue before the suppression court, we consider only the defendant's evidence and so much of the Commonwealth's evidence as remains uncontradicted when read in the context of the [suppression] record as a whole." *Id.* (citation omitted).

We are highly deferential to the suppression court's factual findings and credibility determination. *Commonwealth v. Batista*, 219 A.3d 1199, 1206 (Pa. Super. 2019). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (citations omitted). If the record supports the suppression court's findings, we may not substitute our own findings. *Batista*, 219 A.3d at 1206. However, we give no deference to the suppression court's legal conclusions and review them *de novo*. *Id.*

*Commonwealth v. Carmenates*, 266 A.3d 1117, 1122–23 (Pa. Super.

2021).

Additionally, we note that,

> an investigative detention is valid when it is supported by
> reasonable suspicion.  In the words of the Pennsylvania Supreme
> Court:
>
>> Reasonable suspicion is a less stringent standard than
>> probable cause necessary to effectuate a warrantless arrest,
>> and depends on the information possessed by police and its
>> degree of reliability in the totality of the circumstances.  In
>> order to justify the seizure, a police officer must be able to
>> point to specific and articulable facts leading him to suspect
>> criminal activity is afoot.  In assessing the totality of the
>> circumstances, courts must also afford due weight to the
>> specific, reasonable inferences drawn from the facts in light
>> of the officer's experience and acknowledge that innocent
>> facts, when considered collectively, may permit the
>> investigative detention.
>>
>> ***
>>
>> The determination of whether an officer had reasonable
>> suspicion that criminality was afoot so as to justify an
>> investigatory detention is an objective one, which must be
>> considered in light of the totality of the circumstances.  It is
>> the duty of the suppression court to independently evaluate
>> whether, under the particular facts of a case, an objectively
>> reasonable police officer would have reasonably suspected
>> criminal activity was afoot.
>
> ***Commonwealth v. Holmes***, … 14 A.3d 89, 95 and 96 ([Pa.]
> 2011) (internal citations, quotations, and emphasis omitted).

***Commonwealth v. Clemens***, 66 A.3d 373, 379 (Pa. Super. 2013).

In this case, the Commonwealth first argues that the trial court erred by concluding that Officers Caschera and Bonnell lacked reasonable suspicion to continue their detention of Young beyond the initial traffic stop.[2]  According

_____

[2] The Commonwealth does not present any developed argument that the court erred by concluding that Young's initial detention — *i.e.*, the traffic stop to

*(Footnote Continued Next Page)*

to the Commonwealth, the court failed to properly assess whether an objectively reasonable officer would have suspected criminal activity was afoot and, instead, the "court improperly and repeatedly focuse[d] its attention on the subjective intentions of both [o]fficers." Commonwealth's Brief at 16. In support of its argument, the Commonwealth cites the court's statements that it "believes the officers were determined to search [Young's] vehicle regardless[,]" and that "neither Caschera's nor Bonnell's testimony indicate[s] specific or particular facts that led **them** to believe criminal activity was afoot." **Id.** (citing TCO at 13; emphasis added). The Commonwealth insists that, "[a]t no point in its [o]pinion [did] the suppression court state a belief that an **objectively reasonable** police officer would have (or would have not) reasonably suspected that criminal activity was occurring." **Id.** (emphasis added).

Additionally, the Commonwealth contends that the court erred by concluding the officers lacked reasonable suspicion that Young possessed illegal narcotics in order to detain him for further investigation. The Commonwealth points out that Officer Caschera testified that Young was "shaking and breathing heavily[,]" the officer smelled "an odor of unburnt marijuana that became stronger as [Officer Caschera] leaned closer to the

---

investigate his possible impairment — was extended past its original purpose. Thus, we do not address this conclusion by the court, but focus only on whether the officers possessed reasonable suspicion to further detain Young after he exited his vehicle to investigate whether he possessed illegal narcotics.

car[,]" and Young provided "somewhat unusual answers that [he] was coming from Sheetz but changed his mind and didn't purchase anything." *Id.* at 15. The Commonwealth does not explain how or why these circumstances amounted to reasonable suspicion, nor does it cite or discuss any legal authority to support such a conclusion. Instead, the Commonwealth states:

> Despite this testimony, the suppression court found that "[n]either Caschera's nor Bonnell's testimony indicate specific or articulable facts that led them to believe criminal activity was afoot." [TCO] at 13. This is somewhat disingenuous, as the court addresses [Young's] nervousness and the odor of marijuana in the next two sentences, noting that neither fact alone rises to the level of reasonable suspicion. This is an accurate statement of current caselaw. However, this is not a proper analysis of the totality of the circumstances.

*Id.*

The Commonwealth's undeveloped argument fails to convince us that the court erred in concluding that the officers lacked reasonable suspicion that Young possessed illegal narcotics. The Commonwealth does not cite or discuss any legal authority to support its position that the totality of the circumstances in this case rose to the level of reasonable suspicion. We decline to make such an argument for the Commonwealth.

We also disagree with the Commonwealth that the court failed to objectively assess the entirety of the facts known to Officers Caschera and Bonnell in determining that reasonable suspicion was lacking. In its opinion, the court recognized that its "fundamental inquiry … is to *objectively* determine 'whether the facts available to the officer at the moment of the [intrusion] warrant *a man of reasonable caution* in the belief that the action

- 11 -

taken was appropriate.'" TCO at 10 (quoting **Commonwealth v. Zhahir**, 751 A.2d 1153, 1156 (Pa. 2000)). Although the court mentioned the subjective intent of Officer Caschera, we conclude that it ultimately conducted an objective assessment of the totality of the circumstances in this case, finding that they failed to establish that Officers Caschera and Bonnell had reasonable suspicion to detain Young beyond the initial detention to investigate whether he was impaired. Specifically, the court explained:

> The next question that the court must answer is whether the officers had reasonable suspicion to support [the] unreasonable extension [of Young's initial detention to investigate his possible impairment]. Based on the testimony presented, the court believes this question must be answered negatively. The law requires reasonable suspicion to be more than an officer's mere hunch or unparticularized suspicion. In the case *sub judice*, the record reflects that Caschera and Bonnell suspected [Young] had contraband in his vehicle, but the court fails to find support in the record to verify this suspicion. Neither Caschera's nor Bonnell's testimony indicate[s] specific or particular facts that led them to believe criminal activity was afoot. The Superior Court held that nervousness in someone subjected to a traffic stop does not rise to the level of reasonable suspicion. **Commonwealth v. Cartagena**, 63 A.3d 294, 306 (Pa. Super. 2013). Moreover, following the enactment of the Medical Marijuana Act, it is no longer *per se* illegal to possess marijuana and the smell of marijuana alone does not amount to sufficient probable cause to permit the warrantless search of a vehicle. … **Barr**, 266 A.3d [at] 41, 44…. As such, the smell of marijuana may only be considered as a factor when examining the totality of the circumstances. **Id.** at 44.
>
> In considering the totality of the circumstances as required, the court believes the officers were determined to search [Young's] vehicle regardless. The only factors identified to support a finding of reasonable suspicion at the time the traffic stop was extended were [Young's] alleged nervousness and reluctance to answer officer's questions, the smell of raw marijuana, and [Young's] confession to smoking marijuana earlier that day. Nevertheless,

the court is of the opinion that these factors are not sufficient to establish reasonable suspicion to support the unreasonable extension of the traffic stop. "It is the rare person who is not agitated to some extent when stopped by police, even if the driver is a law-abiding citizen…[.] Whether described as nervousness, apprehension, concern or otherwise, forced interaction with a police officer is not an everyday occurrence for the average citizen." *Cartagena*, 63 A.3d at 306. Although the court acknowledges the smell of marijuana is a small factor, the remainder of the record demonstrates the officers' unparticularized suspicion that [Young] possessed contraband. As previously stated, Caschera testified that he was concerned [Young] possessed marijuana after smelling it upon approaching his vehicle, but [he] told [Young] he was not worried about finding a small amount of marijuana[,] just that he wanted to see if [Young] had anything illegal in the vehicle. If Caschera was not concerned with finding a small amount of marijuana as he indicated himself during testimony, this court struggles to determine what he was looking for in [Young's] vehicle. Aside from [Young's] purported nervousness, no other evidence suggests that [Young] may have possessed other controlled substances. It is apparent from these facts that Caschera had a mere hunch that [Young] hid other narcotics in his car and wanted to go looking for them. For these reasons, this court finds that the unreasonable extension of the traffic stop into a drug investigation was not supported by reasonable suspicion.

TCO at 13-14 (unnecessary capitalization omitted).

Herein, the Commonwealth does not provide any meaningful argument to counter the court's conclusion that reasonable suspicion was lacking in this case. In particular, the Commonwealth does not discuss the cases relied on by the court in reaching its decision, or cite any other legal authority to support its cursory conclusion that the officers possessed reasonable suspicion to extend Young's investigative detention based on his nervousness, strange answer to Caschera's question about where he was coming from, and the smell

of raw marijuana.[3]  Accordingly, we conclude that the Commonwealth has failed to demonstrate reversible error in the court's decision that Young's detention was illegal.

In light of our decision, we need not review the Commonwealth's second issue, which challenges the trial court's alternative conclusion that Young's consent to search the vehicle was coerced and involuntary.  **See** TCO at 14-19.  The court determined that "the Commonwealth has not demonstrated that [the] search was not an exploitation of the unlawful investigative detention and[,] therefore, [Young's] consent is immaterial and the evidence seized pursuant to the warrantless search of [Young's] vehicle must be suppressed."  TCO at 16; **see also Commonwealth v. Strickler**, 757 A.2d 884, 889 (Pa. 2000) ("Where … a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.").  The Commonwealth does not challenge this aspect of the court's decision, focusing only on attacking the court's conclusion that Young's continued detention was illegal.  Because we agree with the court that Young was illegally detained, and that his consent to search was not separate from

_____

[3] The Commonwealth makes no mention of Young's statement that he smoked marijuana earlier in the day.

that unlawful detention, the fruits of that search were properly suppressed by the court.

Additionally, in its third issue, "[t]he Commonwealth concedes that, if the suppression court has hitherto ruled correctly, anything seized pursuant to the search warrant is properly suppressed." Commonwealth's Brief at 21. Thus, no relief is due on the Commonwealth's third and final claim.

Order affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/05/2023